UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

EASTERN CONTRACTORS, INC.,

     Plaintiff,

v.

CITY OF WORCESTER and THOMAS R.
HOOVER, City Manager, and, HEERY
INTERNATIONAL, INC. and THOMAS E.
ELLIS, JR.

     Defendants.

C.A. NO. 03-12216MLW

**OPPOSITION OF THE PLAINTIFF, EASTERN CONTRACTORS, INC., TO
DEFENDANT'S, CITY OF WORCESTER'S, MOTION FOR PROTECTIVE
ORDER**

### I. INTRODUCTION

The Plaintiff, Eastern Contractors, Inc., (hereinafter "Eastern") hereby opposes

the motion of the Defendant, City of Worcester, (hereinafter "Worcester") for a

protective order as to the depositions of high-level Worcester employees, Ms. Jill Dagilis,

Mr. Richard M. Trifero and Mr. Eric Twickler.   Eastern opposes Worcester's motion on

the grounds that each notice of deposition validly served on Worcester seeks documents

and testimony relevant to the pending cause of action; the conduct of Richard M. Trifero,

Eric Twickler, and Jill Dagilis, as agents of Worcester, following the award of the

contract is particularly relevant in ascertaining facts, actions and communications of

Worcester with regard to the project, possible admissions about bidding irregularities and

conversations regarding issues arising in this suit.

Additionally, Worcester's contention that a "conditional arrangement" exists with regard to the order in which the depositions of Worcester and Eastern would be taken, specifically, that said agreement conditioned the depositions of Worcester on that of Eastern is not accurate.  In fact, this is further evidenced by the fact that the deposition of Jill Dagilis of Worcester occurred on Tuesday, April 19, 2005, and by mutual agreement among the parties, was suspended until Thursday, April 28, 2005.  Further, Worcester's contention that Eastern somehow usurped Worcester's authority pursuant to Fed.R.Civ.P. 30(b)(6), is preposterous as it was clear in numerous communications with counsel for Worcester that Worcester had in fact agreed to supply Jill Dagilis (and in fact has supplied Jill Dagilis), Richard M. Trifero and Eric Twickler responsive to Eastern's Notices of Deposition.  This was an agreement by and between counsel to lessen the burden of having to formally subpoena each witness (which is well within Eastern's right under the rules) rather than an Eastern strong-arming of counsel for Worcester to provide the requested deponents.[1]  Eastern further has noticed the witnesses individually.

For the reasons set forth below, Jill Dagilis, Richard M. Trifero and Eric Twickler are critical and important fact witnesses in the pending cause of action and for the reasons cited herein, Eastern should be allowed to inquire into the post-bid activities of each deponent.  Accordingly, Worcester's motion must be denied and any appropriate objections should be made during the depositions of Jill Dagilis, Richard M. Trifero and Eric Twickler to ensure this Honorable Court can rule on a complete record.

---

[1] At no point in time had Worcester objected to Eastern's deposing of Jill Dagilis, Richard M. Trifero or Eric Twickler.

## II. STANDARD OF REVIEW

The Federal Rules of Civil procedure allow examination of a deponent concerning "any matter not privileged which is relevant to the subject matter involved in the pending action." Fed.R.Civ.P. 26(b). Relevant evidence is "evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable that it would be without the evidence." Fed. R. Evid. 401. Relevant evidence need not be admissible at the ultimate trial of the matter so long as the discovery "appears reasonably calculated to lead to the discovery of admissible evidence." Fed.R.Civ.P. 26(b)(1). The court must balance the needs of the party requesting the information and the hardship to the party subject to the deposition. Truswall Systems Corp., v. Hydro-Air Engineering, Inc., 813 F.2d 1207, 1210 (Fed. Cir.1987). The standard in determining relevance, as recognized by the United States Supreme Court, is one broad enough to "encompass any matter that bears on, or that reasonably could lead other matters that could bear on, any issue that is or may be in the case." Oppenheimer Fund, Inc. v. Sanders, 437 U.S. 340, 351 (1978). Relevance "is construed more broadly for discovery than for trial." Truswall Systems Corp., 813 F.2d at 1211 citing Heat & Control, Inc. v. Hester Industries, Inc., 785 F.2d 1017, 1024 (Fed. Cir. 1986) citing Centurion Industries, Inc. v. Warren Steurer & Associates, 665 F.2d 323, 326 (10th Cir. 1981).

For purposes of Rule 26(b)(1), the term relevant "is not to be equated with 'relevant' as ordinarily used in determining admissibility of evidence upon a trial." Foremost Promotions v. Pabst Brewing Co., 15 F.R.D. 128, 129 (N.D.Ill.1953) (quoting Kaiser-Frazer Corp. v. Otis Co., 11 F.R.D. 50, 53 (S.D.N.Y.1951)); accord, Enger-Kress

Company v. Amity Leather Products Co., 18 F.R.D. 347, 349 (E.D.Wis.1955). "Relevancy is broadly construed at the discovery stage of litigation and a request for discovery should be considered relevant if there is any possibility that the information sought may be relevant to the subject matter of the action." Miller v. Doctor's General Hospital. 76 F.R.D. 136, 138 (W.D.Okla.1977) (citations omitted) (emphasis added). Thus, "[d]iscovery should ordinarily be allowed under the concept of relevancy unless it is clear that the information sought can have no possible bearing upon the subject matter of the action." Miller, 76 F.R.D. at 139 (citations omitted). Gagne v. Reddy, 104 F.R.D. 454, 451 (D.Mass. 1993).

### III. FACTUAL BACKGROUND RELEVANT TO MOTION

Worcester submitted its invitation for bids on the new $70 million dollar Worcester Vocational High School project (hereinafter "Project") in early 2003. Eastern is a general contractor, with probably the most public school construction experience in the Commonwealth of Massachusetts. Eastern is qualified and experienced in this field, and certified by the Division of Capital Asset Management (hereinafter "DCAM") of the Commonwealth of Massachusetts which, in accordance with public bidding laws, has strict rules for the qualification of general contractors bidding on public construction projects.

Eastern was the low bidder on the Worcester Vocational School Project by a sum in excess of $1.3 million dollars. The second bidder had never constructed a public school project of the size, magnitude and complexity of this Project. In fact, it was unable to even qualify to construct such a school project except by means of a joint venture between Consigli Construction Company and O'Connor Constructors, Inc. The

Consigli/O'Connor-Joint Venture (hereinafter referred to as "Consigli/O'Connor") had

no track record whatsoever in coordinating work forces on similar major public school

construction projects. In fact, Mr. Anthony Consigli, president of Consigli Construction

Company, purportedly had some influence in Worcester, and wrote a defamatory letter,

addressed to Jill Dagilis, concerning Eastern's qualifications to perform the Project once

he had learned that Consigli/O'Connor was found to be the second low bidder on the

project. A true and accurate copy of Anthony Consigli's letter of February 26, 2003 is

attached hereto as Exhibit A.[2]

Worcester's actions asserting that Eastern is not a "qualified" or a "responsible"

bidder, conflicts with Eastern's DCAM certification and strongly injures its reputation in

the community. Nonetheless, Worcester proceeded to review and to reject Eastern's

qualifications in a false manner. The persons undertaking this action were primarily

defendant, Thomas Hoover, Ms. Dagilis, Mr. Twickler and Mr. Trifero. In later February

2003, post bid and prior to the contract award, Robert Para of Lamoureaux Pagano

Associates (hereinafter "LPA"), as directed by Worcester's Clerk of the Works, Richard

M. Trifero, contacted Consigli/O'Connor directly on "their perspective site contractors

and plans." A true and accurate copy of this email communiqué is attached hereto as

---

[2] In fact, Worcester utilized not only information it had received from Mr. Consigli, but additional matters that were delivered to Worcester via his attorneys, Hinckley Allen & Snyder, LLP (hereinafter "Hinckley Allen"). On February 28, 2003, via Hinckley Allen, Mr. Consigli submitted an eighty-three (83) page fax to Heery and Worcester consisting of the results of a docket search for Eastern's name in court indexes for the entire Commonwealth. Examination of this information revealed a number of cases which involve a totally different entity known as Eastern General Contractors which is not affiliated with Eastern in any way. No explanation as to the nature of each cause of action was provided to Worcester. A number of those cases appear to be matters in which Eastern may have been merely a stakeholder. The list also appears to include docket listings from other jurisdictions not involving Eastern, but another entity with the same name. Additionally, when Eastern sought an injunction following Worcester's award of the Project to Consigli/O'Connor, lawyers at Hinckley Allen, served Worcester's arguments in opposition, as evidenced by that firm's transmittal of Worcester's briefs to counsel for Eastern.

Exhibit B. Consigli/O'Connor in turn responded in writing, via facsimile, providing LPA with its plans and further indicated its plan to complete the work in 30-32 months. Further, Worcester gave a directive not to contact Eastern with regard to the Project, despite it being the low bidder. Also, none of the factors communicated by Consigli/O'Connor seeking the contract were included in Worcester's invitation to bid. This gave an unfair and improper advantage to the second low bidder, Consigli/O'Connor.

Moreover, Heery produced a false and one sided negative review of Eastern upon which Worcester then relied purportedly upon "objective" terms to reject Eastern's bid, to incur an additional $1.3 million dollars in costs on the project of municipal funds, and to award the contract to the favored company, Consigli/O'Connor. A true and accurate copy of the Heery Report is attached hereto as Exhibit C. Such action directly conflicts with the public bidding laws in Massachusetts which are designed to prevent bad faith selections of "favored" contractors. Interstate Engineering Corp. v. Fitchburg, 367 Mass. 751, 758 (1975); Phipps Production Corp. v. Mass. Bay Transp. Auth., 387 Mass. 687, 691-92 (1982); Sciaba Constr. Corp. v. Boston, 35 Mass.App.Ct. 181 (189-190 (1993).

Eastern has encountered circumstances where public statements of a discriminatory manner have been made about its owner's national origin – in one instance, Eastern's company was referred to as "sand niggers" and in another instance a public statement was made about whether Mr. Motwane was a "dot or feather". Frequently, however, action is latent and must be proven by circumstantial evidence, as the leading case in this Circuit recognizes. T&S Service Associates, Inc. v. Crenson, 666 F.2d 722 (1st Cir. 1981).

In the case at bar, Jill Dagilis, Richard M. Trifero and Eric Twickler are critical witnesses for multiple reasons. At all times during the bidding phase and eventual award of the Project, Jill Dagilis, Richard M. Trifero and Eric Twickler held high-level positions within Worcester. In fact, Ms. Dagilis served as the Commissioner of the Department of Code Enforcement, Mr. Trifero as Chief Clerk of Works, Department of Code Enforcement and Mr. Twickler served as Principal Architect, Department of Code Enforcement for Worcester. Each witness took part in numerous pre-bid and post-bid meetings and discussions regarding the Project as evidenced by numerous documents produced by Worcester detailing meetings in which all three were attendees as well as provided factual input and recommendations to the city manager, Mr. Thomas R. Hoover, as to the actual rejection of Eastern's bid on the Project.

For these reasons, the evidence is clearly relevant to material issues on the federal and state claims against Worcester and Heery in this case and the depositions should be ordered to proceed. There is no just cause for this belated effort to quash important information within the broad confines of the rules of discovery.

## IV. ARGUMENT

**A.    A PROTECTIVE ORDER IS NOT WARRANTED AS POST-BID TESTIMONY AND DOCUMENTS SOUGHT FROM JILL DAGILIS, RICHARD M. TRIFERO AND ERIC TWICKLER, ALL HIGH-LEVEL WORCESTER EMPLOYEES, ARE RELEVANT TO THE ISSUES IN THE PENDING CAUSE OF ACTION**

A protective order limiting the deposition testimony of Jill Dagilis, Richard Trifero and Eric Twickler is clearly not warranted in this case. Post-bid documents and testimony would allow Eastern to inquire into the activities and statements of Worcester occurring both before and after the award of the contract. Specifically, whether or not

7

meetings took place in which Heery and/or Worcester were present pertaining to the Project would be relevant in determining whether in fact the Project proceeded as scheduled.  Additionally, post-bid communications by and between Heery, Worcester and/or any person party or entity which incorporated, discussed and/or commented on Eastern's bid would clearly be relevant.  Further, as identified during the course of discovery there existed pre-bid communications between Heery, Worcester, specifically of Richard M. Trifero, and Consigli/O'Connor, as to Consigli/O'Connor's "perspective site contractors and plans" and where Consigli/O'Connor indicated its plan to complete the work in 30-32 months.  See Exhibit B.  This occurred following direction from Richard Trifero not to contact Eastern with regard to the Project despite it being the low bidder and, where none of the factors communicated by Consigli/O'Connor were included in Worcester's invitation to bid.  Whether in fact these illegal pre-bid promises were realized during the course of construction are indeed relevant in assessing not only the validity of the Heery Report but also whether these pre-bid promises influenced the selection of Consigli/O'Connor.

Additionally, on March 26, 2003, Worcester, based on the recommendations and input of Jill Dagilis, Richard M. Trifero and Eric Twickler among others, submitted a letter to Eastern rejecting Eastern's bid as "not the lowest responsible bidder" on the Project.  Worcester further stated Eastern "fails to demonstrate [it] possessed the skill, ability and integrity to perform this particular contract" and that Eastern "failed to meet the project management requirement of the bid specifications" (emphasis added).  A true and accurate copy of this document is attached hereto as Exhibit D.  It is this specific reference that is particularly relevant to Worcester's post bid activities, that is whether in

fact Consigli/O'Connor was held to the project management requirements of the Project which was, as Worcester deemed, relevant in its determination that Eastern was not the lowest eligible and responsible bidder on the Project. If Consigli/O'Connor was not, then clearly it should not have been a factor in rejecting Eastern's bid. Clearly, in order to assess whether Consigli/O'Connor was held to the same standard as Eastern with regard to project staffing requirements, Eastern must be able to inquire into the post-bid activities of Worcester, specifically as to high-level employees, Jill Dagilis, Richard M. Trifero and Eric Twickler, and others.

Accordingly, such matters are relevant, primarily since courts have consistently recognized the need to rely upon circumstantial evidence concerning a party's racial intent as it is highly unlikely that a defendant will produce direct evidence or "smoking gun" demonstrating its unlawful intent. See, e.g., Stepanischen v. Merchants Despatch Trans. Corp., 722 F.2d 922, 929 (1st Cir. 1983); Baker v. Coxe, 52 F.Supp.2d 244, 250 (D.Mass. 1999); Smith v. F.W. Morse & Co. Inc., 76 F.3d 413, 421 (D.N.H. 1996); Hoeppner v. Crotched Mountain Rehabilitation Center Inc., 1993 WL 730415, 3 (D.N.H. 1993). As this testimony and evidence reasonably could lead to other matters that could bear on substantive issues, it is clearly relevant. Oppenheimer Fund, Inc. v. Sanders, 437 U.S. 340, 351 (1978).

Additionally, if Eastern were to prevail in the pending cause of action, it would be entitled to seek money damages as Worcester and Heery violated Eastern's rights and should have awarded the contract to Eastern as low-bidder entitling Eastern to the value of the profits of the contract. Though section 1983 of the United States Code[3] does not

---

[3] Section 1983 provides:

specify the nature or extent of money damages available to an "injured party", federal common law has evolved on the subject, and would use the same measure of damages under the bad faith denial of a successful bid under the state law claim.[4] In Memphis Community School Dist. v. Stachura, 477 U.S. 299, (1986), the Supreme Court commented, "(w)e have repeatedly noted that 42 U.S.C. §1983 creates 'a species of tort liability' in favor of persons who are deprived of 'rights, privileges, or immunities secured' to them by the Constitution." Id. at 305 quoting Carey v. Piuhus, 435 U.S. 247, 253 (1978) and Imbler v. Pachtman, 424 U.S. 409, 417 (1976) (footnote and other citations omitted). See also, Smith v. Wade, 461 U.S. 30, 34 (1983) and Newport v. Fact Concerts Inc., 453 U.S. 247, 258-259 (1981).

As in tort law, damages under §1983 are intended to provide full compensation to the injured party for injury caused by the defendant's breach of duty. Stachura, 477 U.S. at 306. In determining the appropriate measure of damages, courts look to the full extent of the loss, including out-of-pocket costs as well as other monetary harm and, in appropriate cases, damage to reputation, humiliation, mental anguish and suffering. Id. at 307; See also Gertz v. Robert Welch. Inc., 418 U.S. 323, 350 (1974) and Carey at 264 (mental distress compensable under §1983). In Stachura, supra, the Court also

---

Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress.

[4] In instances where the wrongful rejection of a bid is in bad faith, or is arbitrary and capricious, the sanction is lost profits. Roblin Hope Industries. Inc. v. J.A. Sullivan Corp., 6 Mass. App. Ct. 481, 489-491 (1978); Bradford & Bigelow v. Commonwealth, 24 Mass. App. Ct. 349, (1987); J.S. Luiz. III. Inc. v. Town of Hanson, No. 94-P-2112, Slip Op. (Mass. App. Ct., August 13, 1996), Cf. Peabody Constr. Co., Inc. v. City of Boston, 28 Mass. App. Ct. 101, 106 (1989). The Appeals Court upheld the award of lost profits in a case where the refusal of the Town of Hanson to exercise its discretion to waive an informality in a bid which was deminimus, was found to be arbitrary and capricious. J.S. Luiz. III. Inc. v. Town of Hanson.

recognized that, in addition to the above factors, "(d)eterrence is ... an important purpose

of this system, but it operates through the mechanism of damages which are

compensatory...." Id. at 307.

On the constitutional claims, the measure and scope of damages is described by

the United States Supreme Court as follows:

> In order to further the purpose of §1983, the rules governing compensation
> for injuries caused by the deprivation of constitutional rights should be
> tailored to the interests protected by the particular rights in question . . .
> We agree with Mr. Justice Harlan that 'the experience of judges in dealing
> with private (tort) claims supports the conclusion that courts of law are
> capable of making the types of judgment concerning causation and
> magnitude of injury necessary to afford meaningful compensation for
> invasion of constitutional rights.'

Carey, 435 U.S. at 259 (quoting Bivens v. Six Unknown Federal Narcotics Agents, 403
U.S. at 409 (Harlan, J., concurring in judgment)).

Eastern was eligible and qualified to perform the contract at issue in this case. It

would have performed the Contract in its entirety, including any and all change orders

issued on the Contract but for unconstitutional or improper obstacles placed in its path by

Worcester and Heery. The facts of this case compel the conclusion that Worcester's and

Heery's unconstitutional actions deprived Eastern of the Contract and that meaningful

compensation under §1983 includes full recovery of all the benefits of that contract

including post-bid changes to the Contract.  See Adarand Constructors, Inc.v. Pena, 115

S.Ct. 2097, 2104 (1995) ("Adarand's allegation that it has lost a contract in the past

because of a subcontractor compensation clause of course entitles it to seek damages for

the loss of that contract....") (emphasis added).  Indeed, the United States Court of

Appeals for the First Circuit, citing Carey and Stachura, has specifically held that lost

profits are the appropriate measure of damages where a contractor loses a contract as the

result of unconstitutional, race-based state action. T&S Service Associates. Inc. v. Crenson, 666 F.2d 722 (1st Cir. 1981).

In T&S, a minority-owned catering service claimed that a municipal school committee and school superintendent had wrongfully denied a federally funded school lunch contract to it because of race. Id. The plaintiff in T&S prevailed in the United States District Court for the District of Rhode Island and was awarded compensatory damages for lost profits. T&S at 723, 728. On appeal, the First Circuit remanded the case for further findings but commented specifically on the appropriate measure of damage under 42 U.S.C. §1983 for the loss of a contract as follows:

> In the case of an injury of an economic nature the injured party is to be placed as near as possible in the situation he would have been in had the wrong not occurred. (citation omitted). Thus, damages for the relevant period are to be determined by measuring the difference between plaintiff's actual earnings for the period and those which he would have earned absent the discrimination of defendants. (citation omitted).

T&S, 666 F.2d at 728.

Here, there is evidence related to the calculation of Eastern's lost profit damages on the Project arising from post-bid activities, particularly of Worcester. Worcester served as the Project's owner and was intimately involved in the Project throughout construction. Change orders, request for information, scope changes and the like would impact the cost of the Project and in turn would be directly relevant to Eastern's lost profits analysis. Additionally, if there were Project delays, this would again impact Eastern's analysis. Absent testimony and documents pertaining to post-bid activities, Eastern is left to solely rely on the contract amount set forth in Consigli/O'Connor's bid. This, however, is not an accurate reflection of the course and scope of the Project as built.

Construction projects, primarily those of this magnitude, inevitably encounter factors that influence the cost of the Project. These factors have a clear bearing upon the subject matter of this cause of action. Absent a clear showing to the contrary, this Court must allow Eastern to inquire into the post-bid activities of Worcester. Miller v. Doctor's General Hospital, 76 F.R.D. 136, 138 (W.D.Okla.1977).

**B.    NO CONDITION PRECEDENT TO THE SCHEDULING OF THE DEPOSITIONS OF WORCESTER EXISTED AS EVIDENCED BY WORCESTER'S OWN ACTIONS AND CONDUCT**

Worcester mistakenly asserts that there existed a mutual agreement to conduct the depositions of Eastern *prior* to the depositions of Worcester. However, as it is clear from Worcester's own actions, no such agreement existed, and Worcester agreed to the postponement of the deposition of Eastern. Though Worcester asserted such a condition in its correspondence of January 28, 2005, Eastern never in fact agreed to such a condition and in fact, in light of this Honorable Court's previous scheduling order, moved without haste to notice the depositions of Worcester only after repeated discussions with counsel for Worcester.[5]

Despite its initial position, Worcester never again insisted that the deposition of Eastern take place prior to the depositions of Worcester. This is nowhere clearer than in Worcester's own actions, that is, Worcester produced Jill Dagilis for deposition on April 19th and, by mutual agreement of the parties, Ms. Dagilis's deposition was suspended until Thursday, April 28, 2005 at 2:00 pm.

The parties are moving forward with discovery in this matter and counsel for Worcester and Eastern engage in weekly discussions to ensure that each side is

---

[5] On April 5, 2005 counsel for Eastern confirmed, via correspondence to counsel for Worcester, that Ms. Jill Dagilis, Mr. Richard M. Trifero and Mr. Eric Twickler would be produced by Worcester. A true and accurate copy of this document is attached hereto as Exhibit E.

complying, diligently and in good faith, with other counsel's discovery requests. To burden the court with this belated and untrue position amounts to a waste of this Honorable Court's time and delays the expedient processing of this cause of action. Worcester's position is unwarranted and this Honorable Court should leave among counsel to agree, which counsel has, to conduct depositions in the manner and course amenable to the schedules of counsel and the deponents.

## C. WORCESTER AGREED TO AND CONCEDED TO THE PRODUCTION OF RICHARD M. TRIFERO, JILL DAGILIS, ERIC TWICKLER AND OTHERS

Worcester's contention that Eastern has somehow usurped its role of designating deponents is also inaccurate. As stated previously, all depositions of Worcester employees have been discussed, in detail, with counsel for Worcester. Worcester has agreed to the production of Ms. Jill Dagilis, Mr. Richard M. Trifero and Mr. Eric Twickler, which is further evidenced by the fact that Worcester produced Jill Dagilis for deposition on April 19th and, by mutual agreement of the parties, Ms. Dagilis's deposition was suspended until Thursday, April 28, 2005 at 2:00 pm.[6]

Notwithstanding the fact that Worcester has agreed to the production of the requested deponents, Worcester has not once stated an objection at any time to the depositions of Ms. Jill Dagilis, Mr. Richard M. Trifero and Mr. Eric Twickler. In fact, Worcester's current objection is untimely under Fed. R. Civ. P. 32(d) (1) which provides that "[a]ll errors and irregularities in the notice for taking a deposition are waived unless written objection is promptly served upon the party giving notice." Further, Eastern has

---

[6] As of the date of this brief, counsel for Eastern and counsel for Worcester have agreed to a postponement of the depositions to a later date (which will be more than 30 days following service of the April 6, 2005 deposition notices). This fact renders Worcester's concern regarding the production of documents pursuant to Fed.R.Civ.Pro. 30(b)(5) moot.

exercised its right, after reviewing Worcester's documents to notice the depositions of specific individuals employed by Worcester, including Ms. Jill Dagilis, Mr. Richard M. Trifero and Mr. Eric Twickler. Accordingly, Worcester's request for a protective order permitting Worcester to designate its deponents is moot and should be denied.

## V. CONCLUSION

For the foregoing reasons, Eastern respectfully requests that this Honorable Court DENY Worcester's Motion for a Protective Order and allow reasonable inquiries as may be permitted by the rules of discovery and which might lead to discoverable information. Counsel can object to questions if they are too far removed from reasonable inquiry.

EASTERN CONTRACTORS, INC.,

By its attorneys,

Edward F. Vena (BBO# 508660)
Sabatino F. Leo (BBO# 642302)
George C. Deptula (BBO#1200820)
Vena Riley Deptula LLP
250 Summer Street, 2nd Floor
Boston, MA 02210
(617) 951-2400

Edward J. Quinlan (BBO#409060)
Quinlan & Sadowski, P.C.
Vanderbilt Avenue, Suite 250
Norwood, MA 02062
(781) 440-9909

27 April 2005

15

## CERTIFICATE OF SERVICE

I, Sabatino F. Leo, Esquire, hereby certify that I have, on this 29th day of April, 2005, served a copy of the within by first-class mail, postage pre-paid upon the following parties:

Warren D. Hutchison, Esq.
Donovan Hatem, LLP
Two Seaport Lane
Boston, MA  02210

Donald V. Rider, Jr.
Assistant City Solicitor
City of Worcester Law Department
City Hall, Room 301
Worcester, MA  01608


_____
Sabatino F. Leo, Esquire

# CONSIGLI CONSTRUCTION CO., INC.

*FAX ORIGINAL*
*# 02080.02*

---

### FACSIMILE TRANSMITTAL SHEET

| TO | FROM: |
|---|---|
| Mr. Frank M. Kennedy | Anthony Consigli |

| COMPANY | DATE: |
|---|---|
| Heery International, Inc. | 2/26/2003 |

| FAX NUMBER | TOTAL NO. OF PAGES INCLUDING COVER: |
|---|---|
| 1-781-860-9108 | 4 |

| PHONE NUMBER | SENDER'S REFERENCE NUMBER: |
|---|---|
| 1-781-860-9100 | |

| RE: | YOUR REFERENCE NUMBER: |
|---|---|
| | |

☐ URGENT   ☐ FOR REVIEW   ☐ PLEASE COMMENT   ☐ PLEASE REPLY   ☐ PLEASE RECYCLE

---

Notes/Comments

Please see attached letter.

**HRY 00009**



# CONSIGLI CONSTRUCTION CO. INC.
### EST. 1905

Jill C. Dagillis
Commissioner
City of Worcester
Department of Code Enforcement
25 Meade Street
Worcester, MA 01610

Dear Commissioner Dagillas:

We are writing on behalf of Consigli/O'Connor as the apparent second low bidder on the Worcester Vocational School Project.

Subsequent to bid time, we have reviewed Eastern Contractors' apparent low bid and have researched their capabilities to perform the project. In reviewing the bids and making your final decision, we ask that you consider the following:

1. **DCAM Update Statement:** Prior to the Worcester Voke bid, Eastern was recently the low bidder on the $50 million Algonquin School Project in Northborough. We recommend that you review their DCAM Update Statement to confirm that they have listed this project against their DCAM limits as well as properly reported their costs to complete on other projects. Failure to do so is misleading and deceptive and may be grounds for rejection alone.

2. **Inability to Properly Staff the Project:** Eastern's current workload has limited their ability to properly staff their projects. A specific example is the Medway High School Project, where there has reportedly been a lot of staff turnover to the detriment of the project. With the addition of Worcester Voke to their workload it is unlikely that they can staff the project properly. We recommend that you review their proposed personnel information to ensure that they are in fact available and qualified to administer a project of this complexity. Furthermore, with the inclusion of Algonquin, adequate staffing is even more unlikely. Eastern is known to hire for projects as they acquire them. We expect that they have either proposed the same team for both the Algonquin and Worcester Voke projects or they will be hiring unfamiliar and untested staff for the project. If so, they have misled the City of Worcester into believing that they are capable of performing the project as bid.

**HRY 00010**

3. **Litigious Patterns and Behavior:** Eastern is notorious industry wide for being involved in numerous lawsuits, claims and projects that are behind schedule. The Medway project and the Framingham High School Project are specific current examples of claim ridden projects that are behind schedule. The City of Worcester knows first hand of their litigious patterns, having recently been involved in an Eastern lawsuit during the Quinsigamond School Project. We also know first hand of their deficiencies, as we have been called in to potentially take over their work for the Lakeville School District where they have failed to complete the work.

4. **HVAC Rejection:** Their Filed Sub Bid to perform the HVAC work should be rejected. As identified on their bid form, Eastern has not performed an HVAC project where they have also been the General Contractor for any HVAC project in excess of $2.2M. Their current bid for the HVAC work at Worcester Voke is $7.7M. They have not proven they can perform HVAC work event remotely comparable to the work of this project, especially when they are also focused on performing the work of the General Contractor. This scenario as it stands could severely jeopardize the Worcester Voke project quality and schedule. KMD Mechanical, the second low HVAC Filed Sub Bidder, shares our concerns, as they have filed a protest against Eastern's HVAC bid with the Attorney General. The mechanical system for a school building housing children should not be a test case for Eastern's HVAC capabilities.

5. **Sitework Issues:** The sitework on the Voke project is of the utmost importance to the overall success of the job. On prior projects, Eastern has estimated the cost of this work at a very low price at bid time, only to find our later that they could not perform the work for the price they carried. This leads to them seeking additional money from the Owner and hiring unqualified subcontractors, or attempting to self-perform the work at an unreasonably low price and with unqualified personnel. This is the recipe for claims, schedule delays and poor quality. We believe that the discrepancy between Eastern's bid price and the other bidders is in a large part on their inability to accurately price and perform sitework.

The city has to ask themselves if the $1.3 million difference between the Eastern and Consigli/O'Connor bids will have been a good value four years from now, after change orders, claims, schedule delays, legal challenges, quality issues, never ending punch lists, hassles, and the negative publicity which stems from all of the performance issues with a typical Eastern project. The low bid at bid time is not necessarily the lowest cost at the completion of the project, and it definitely is not necessarily the best value.

Eastern Construction has a poor reputation in the public school construction market. Eastern has a reputation for continually under-bidding projects, hiring for the job, and surviving on the cash flow rather than the merits of each job. The problem with this "roulette" methodology is that when the music stops, and it will stop, the municipalities with Eastern on its projects will be left to deal with the costly fall out. The city has the

HRY 00011

opportunity to make a strong statement for all municipalities stuck with our state's cumbersome procurement system, and say that it is not continually acceptable for a contractor to over-commit and under-perform; that contractors need to take heed of qualifications and working relationships rather than continual reliance solely on low bids with the intent of getting the difference back in other ways; that you cannot sue a municipality and its agents, completely disregard all tenants of team-work and ethics, and then expect to get their next project. The city has the ability to reject Eastern's low bid as it is not in the best interest for the city to accept it and deal with the problems their involvement will bring. Taking the low bid for the sake of the money is a gamble at best.

The Worcester Vocational School is a high profile, highly visible project within the city and region. It is not an ordinary municipal school building project. The city and its agents have to ask who they want on their team for the next three years, in whose hands do they want to leave this project, and which contractor would provide the best overall value at the end of the day?

Sincerely,

Anthony Consigli
President

AMC:mm

cc:   Heery International
      Lamoreux – Pagano Architects
      Rick Trifero – City of Worcester

**HRY 00012**

CONSIGLI CONSTRUCTION CO. INC.



## Ellis, Thomas

**From:**      Rob Para [rpara@lamoureuxpagano.com]
**Sent:**      Tuesday, February 25, 2003 8:55 AM
**To:**        Ellis, Thomas
**Subject:**   RE: contact Eastern

Thank you Tom
I also talked with Warren and asked him to ask you to call Jill also as explained that we
may or may not have definitive answers by wed but certainly direction and other issues
that need further study or ref calls

Warren will forward to LPA the Architects name on the Framingham project and we will
contact
the references I have been getting on eastern have been ok there have been concerns on
manpower and scheduling but no uncompleted work certainly punch list and coordination
issues.

We discussed Eastern (and Munbardy though we do not know who yet ) with CRJ and they
indicate that they require a lot of "hand holding and oversight  " but there are no
glaring issues

LPA has postponed the consultants meeting for Wednesday and I will forward an agenda and
info for review prior to we felt it would be more productive to have additional info on
the contractors proposed team and site subs prior to meeting
We still should get together to discuss heery's projected role in supervision and will
augment w/ consultants

thank you
rob para jr

>>> "Ellis, Thomas" <TEllis@heery.com> 02/25/03 06:44AM >>>
Rob:

I will contact Frank Marino at Eastern today to request additional information on the
project team and site subcontractor/environmental monitoring team.  I am in Baltimore at a
conference and will return tonight. You can reach me on my mobile phone if we need to
talk.  When I get a break I will try and contact you.

I plan on being in your office tomorrow AM for the environmental team meeting and the e-
Builder meeting in the afternoon.

Tom

-----Original Message-----
From: Rob Para [mailto:rpara@lamoureuxpagano.com]
Sent: Monday, February 24, 2003 3:49 PM
To: Ellis, Thomas
Cc: Dick Lamoureux; Todd Manning
Subject: contact Eastern

Hi Tom
Mike Obrein canceled today's meeting though no one told me, which allowed a short meeting
with Jill and Eric, later joined by Rick
Jill requested to have recommendations for the manager on Wed . and I indicated that Rick
advised that LPA not contact Eastern and believe he gave you the same direction
I indicated that crucial to our assessment was knowing who their team was going to be site
and supervisory as the wetland mitigation issues and site were key
assesment of manpower and scheduling would be Heery's expertice.

JILL INDICATED THAT WE SHOULD CONTACT EASTERN AND OBTAIN A RECOMMENDATION BY WED ...
I indicated as earlier discussed with you that it would  probably come as a first call and
obtain answers (or not)

                                          1

HRY 00002

and we would probably want to sit with them and in detail review the job and scope etc.

I WOULD SUGGEST AS EARLIER YOU MAKE THE FIRST CALL AND SET UP A DIALOG AND THEN WE FOLLOW UP please advise

the manager is also wishes to request that they substitute the low filed subs (KMD) and our opinion was earlier stated
(following is a draft letter sent to Eric last week)
(this opens up a situation that if the city requests one low they should go for all the lows and they will truly become our sub-contractors and begin on a sour note )

please advise
thanks
rob para jr

Eric
Please advise when Mike O'Brien et-al wishes to reschedule, I am free Wed and Thurs. of this week ard Mon, Tue. and Fri. of next week .

We (and Chris Gagliastro) rec'd letter from The foundation for fair contracting of Massachusetts and draft response is as follows we will not finalize until we discuss with the city and Tom Ellis when he is back next week

thanks and advise
rob para jr


18 February 2003                    DRAFT- DRAFT- DRAFT



Ms. Jill Dacilis, Commissioner
Department of Code Enforcement
25 Meade Street
Worcester, MA 01610

Re:  Worcester Vocational High School - Phase II
     General Bid Review Requested Substitution

Dear Jill:

We are in receipt of the February 12, 2003 letter from Foundation for Fair Contracting of Mass.  They request a substitution of KMD for Eastern's Mechanical division and further go on with allegations of Eastern's sub-subcontractors, General Mechanical and Thermo Dynamics.

1.    On the first issue of substitution, two items come into play:

(from 149 Sec. 44E line 57-60) "the awarding authority may substitute for any sub-bid field with the awarding authority by another sub trade*".

Our question to the City would be primarily, what is in the best interest of the project and of the awarding authority, for the City to substitute any bidder, reject any bidder or take any action.

The City must consider that they cannot compel the General Contractor to agree to substitute, and the General Contractor may object to the substitution, as they may have a better working relationship with their own mechanical division than with the lower sub bidder and could object to the "standing an ability of the low contractor" as allowed by MGL.  At best the city could ask for a contractual adjustment for the cost difference, which I would not recommend.

The City should consider the monetary value, KMD's price with alternate No. 1's is $7,689,000 vs.  Eastern's  $7,700,000 is a  (we assume from conversation that the alternates 1-4 will be selected by the City) $11,000 difference (one one-hundred fiftieth of the price).  This in the writer's opinion is a small amount over the value of this contract, and LPA's policy has been that the General Contractors carry the subs that they

2

HRY 00003

can work with and the monetary considerations have already been made in their overall price with O&P and ability to work with their sub-contractors taken into consideration.

LPA has worked in the past with both KMD (Shrewsbury High School, punch list now underway and Shrewsbury Middle School, now underway, as well as other jobs in the past) and have worked with Eastern Mechanical Division (All School) and in our opinion each has the means to complete the project.  LPA has also worked with General Mechanical (Bullard St. School in Holden, Houghton/Chockset School in Sterling , and The Norback school in Worcester) as the prime mechanical contractor and there have   been issues however the issues have been resolved. Eastern has carried General mechanical as their sheet metal sub and not as the prime Mechanical contractor and the burden of coordination falls with Eastern. And these issues should be raised with Eastern.

The City must advise LPA/Heery on what discussion we should have with the Contractor on these issues, and the contractor must advise the city on their objections to substitute and their abilities to coordinate their sub-sub contractors.


2.    On the allegations of the sub-sub, General Mechanical, my first blush it appears the problems are punch list and primarily the mechanical systems controls, and there are also issues regarding the design of the systems. The city/Heery/LPA and our mechanical consultant should review the referenced material.

3.    On the allegations of the sub-sub, Thermo Dynamics apprentice program, this is an issue for the City to address.

Please advise,


Robert Para, Jr., A.I.A.
Project Architect

RP/pf

cc:   Rick Trifero
      Eric Twickler
      Tom Ellis
      Todd Manning




Hi Tom
I called Rick, and as you know he and Warren went to Boston to review the files of Eastern.
as you mentioned in your e-mail I checked with Rick and reviewed LPA's concerns as outlined in our earlier e-mails and telcoms on the site and manpower concerns
He advised LPA not to call Eastern at this time
but we were to call the no 2 contractor, Consigli and discuss the similar issues with them
memo of tel-com as follows.

WE should met  as you indicated to review notes and city directives
on wed possibly after our site meeting.

Verbally we have heard the proposed Eastern team for Algonquin is different but I will have Todd check with Jack Fergeson  from their PM

thanks and advise
rob para jr


Mr. Rick Trifero
City of Worcester
Department of Code Enforcement                          **HRY 00004**

25 Meade Street
Worcester, MA  01610

Re:  Worcester Vocational High School
     Phase II

Dear Rick:

As discussed and directed, we questioned Consigli on their perspective site contractors and plans.  Eric Steinmetz faxed the following (tel. 508-458-0368).

Site Environmental Consultant:      Sanford Ecological
                                    Dr. Gary Sanford

Arborist:                           Bartlett Tree

Landfill Closure:          ETL from Stowe Ma.

School Site                Combination Pytco/ETL/Self-Performing

Consigli will self perform much of the excavations to maintain control over environmental issues and production.

Consigli's plan is to complete the work in 30-32 months.  Consigli's site super is Brandon Seaman (resume in bid package).  They have much of their own site equipment and could be prepared to immediately mobilize and take control of the site and environmental controls. He Consigli welcomes a meeting to discuss their capabilities and strategies at any time.

We will question Eastern on the same as soon as directed.

Sincerely,


Robert Para, Jr., AIA
Project Architect

RP/aw

cc:  Tom Ellis, Heery

9815/Corres/Owner/9815CO-CLIld.(HEALTH&CODE).doc


Rob:

Check with Rick Trifero to see what he has done in my absence.  I understand that he and Warren Pearson were heading to DCAM today to review the files.  I do feel that it is important for a meeting to be set up with the City, LPA, Heery and Eastern to discuss and review all these issues before Eastern is tendered a contract.  I suggest that we have this meeting as soon as everyone's schedule will allow next week and following submission of information (in writing) on Eastern's management team and key non-filed subcontractors.

Tom

-----Original Message-----
From: Rob Para [mailto:rpara@lamoureuxpagano.com]
Sent: Wednesday, February 19, 2003 4:53 PM
To: Ellis, Thomas
Cc: Todd Manning
Subject: easterns site contractor

**HRY 00005**

Hi Tom
(sorry to bug you on vacation)
In preparation of our meeting with the site consultants wed we wish to have an understanding of who Easterns site contractor(s) will be  Dick and I also see this as critical to qualifying Eastern and assessing that they have the understanding and

capabilities to do the work and the protection of the vernal pools and wetlands
Eastern traditionally has contracted with CK Munbardy and we have concerns with their
understanding of the scope and project
as we are currently in litigation with them on a number of issues

Also our site consultants CRJ,JNEI,WSE have made additional contractual requests for site
supervision and having the knowledge on "who the devil might be" will guide us on
reviewing and revising back their contracts
The environmental services contract is hourly to the contract and would be greatly capped
with a contractor that has a good understanding

Knowing you are away Dick has offered to call Frank Marino or Ramesh to discuss
thanks and advise
rob para jr

  MEMO OF 2/18/03
Tom
following is status of the Algonquin project and eastern

Hope you made it safely to florida and the weather did not follow you
enjoy your kids, etc and vacation
rob para jr


Todd,

No contract has been signed yet.  We anticipate that it will be signed
before the end of the month.  The amount of the low base bid is $44,427,000,
( Eastern).  Alternates add approximately 3 mollion more.

Jack

  MEMO OF 2/13/03
Tom
we wish to coordinate our joint and the city's review of eastern's bid information and
issues
toward that goal
1. the city will review all the forms and written results compare the numbers /figures etc
2. Heery will discuss w/ Easterns Frank Marino and obtain information on their proposed
team and qualifications
3. I would also like you to determine the names of their major non filed subs particularly
the site
4. I would like to review with eastern scope of work that they have indeed included all
the items we believe should have been and particularly how comprehensively, erosion
controls wetland and vernal pool mitigation , that they have included all fees permits,
temporary power and coordination or these issues with their major subs

I wish to do a check list and if you can review with Frank who I should be discussing it
with and how you suggest either a meeting or via phone

5. review or update statement and review of their files

I notice that they have not included or I have not found Algonquin (northbro/southbro high
school) in their update statement
which is worth $ 40 - $42 million , rumor has it that they are also low on another school
worth $ 30 MIL
these may not be under contract yet but heard that algonquin is close Todd will check with
the CM on that project as he knows him
thanks and advise
rob para jr

24 February 2003


**HRY 00006**



# HOOVER EXHIBIT A

# HEERY REPORT

# HEERY

March 19, 2003

Ms. Jill C. Dagilis
Contracting Officer
City of Worcester
Office of Code Enforcement
25 Meade Street
Worcester, MA 01610

RE:     Worcester Vocational High School, Worcester, MA
        General Construction Bid Review – Eastern Contractors

Dear Jill:

We have completed the review of the bids, as well as a detailed review of the references for the two apparent low bidders, and would like to forward our review for your consideration in determining the Award of the General Construction contract for this project. This bid review is for Eastern Contractors, Inc. (Eastern) only.

Our review of Eastern's bid was concurrent with that of Lamoureux Pagano Associates (LPA). LPA focused on contacting the design team references, while Heery contacted the Owner references. Not all of the references that were contacted returned our calls. Our review also included knowledge of facts from working with Eastern Contractors on four school projects over the past five years as construction managers for the Towns of Sudbury & Lynnfield and the Cities of Springfield & Fall River.

## Review of DCAM Files

The Division of Capital Asset Management (DCAM) certification files for Eastern were also reviewed. Eastern currently has a reported average performance rating of 87. Of particular note was an extremely poor rating of 51 on a project for Framingham State College. This review is factored in the current performance rating. Eastern provided additional information on this project with their revised Update Statement, which is referenced later.

## Review of Form for General Bid

Our review of the Form for General Bid found no issues. This concurs with the findings of both LPA and the City's Contract Compliance Office.

Heery International, Inc.

A group of architectural service providers
8 Main Drive, Suite 300, Lexington, Massachusetts 02421
Telephone 781-860-8700  Fax 781-860-9108

ATLANTA & LYNCHBURG BEND, OR BERLIN RESTON CENTREVILLE VA CHICAGO CLEVELAND DALLAS DENVER EDINBURGH
HOUSTON LONDON LOS ANGELES MADRID MIAMIVILLE NEW YORK NEWARK, NJ PHILADELPHIA PORTLAND RALEIGH
RICHMOND SACRAMENTO SAN DIEGO SEATTLE SPRINGFIELD, MA TAMPA WASHINGTON, DC

# HEERY

Letter to Jill Dagilis
March 19, 2003
Page 2 of 8

## Review of DCAM Update Statement

In the review of Eastern's Update Statement there were a number of issues that needed further explanation or correction.  These issues were with respect to proper staffing and management, missing or inconsistent information and explanation of issues relayed from other communities in which Eastern has worked or is currently working.  With the City's concurrence, in accordance with 810 CMR 4.09 (1), Eastern was allowed the opportunity to correct any defects that in fact existed in their Update Statement.  This was communicated to Eastern in our letter of March 6, 2003.

In response to our letter, Eastern submitted a revised Update Statement dated March 10, 2003 and, through their attorney, a letter responding to the issues outlined in our letter.  Eastern also provided additional information for our review on March 14, 2003 proposing an alternative staffing plan for the project and providing supplementary DCAM Contractor Certification forms for our review.

In reviewing the information provided by Eastern, we found some information submitted in the revised Update Statement of Eastern, dated March 10, 2003, that, from information presented to us by other sources, appears to be inaccurate.  In the information submitted on March 14, 2003, there were proposed changes and clarifications to the staffing plan that now indicate understanding of the project staffing specifications.  We ask that the City of Worcester review the information that we have obtained to determine the legal status of these findings as to whether Eastern did not provide appropriate supervisory personnel in their bid and for making materially false statements in their Update Statement.

## DCAM Update Statement: Parts 1 & 2 / Completed & Current Projects

There are a number of projects that Eastern has indicated on their Update Statement as "on schedule" which according to the owners of the projects were not completed within the contract timeframe or are not currently on schedule.

### Freetown-Lakeville Middle School
On their original Update Statement Eastern noted this project as 'under contract' and that it was on schedule.  In their revised Update Statement, Eastern moved this project to the completed projects list, while changing the completion date to 06/2002 from 4/2002.  According to Freetown-Lakeville officials, total project was to be completed by April 2002.  It was noted that the educational components of the project were completed just in time for the start of school in September of 2002 with the gym and lockers completed two months late.  There was mold problems requiring the removal of a large portion of a concrete masonry wall (approximately 120 feet by 1-1/2 stories) a month prior to opening.  There still remain some 10 athletic fields that are not completed and will not be available for use for some time.

# HEERY

Letter to Jill Dagilis
March 19, 2003
Page 3 of 8

### Greene and Borden Schools – Fall River

On their original Update Statement Eastern noted this project as 'under contract' and that it was on schedule. In their revised Update Statement of March 10, 2003, no change to the status of the construction schedule was made, however they changed the end date of the project from 11/15/2002 to 09/02. According to Fall River officials, the new school buildings received Substantial Completion on January 4, 2003, two days prior to the start of school. However, the total project scope (demolition of an existing school) still remains incomplete as this work was to be completed within the original contract timeframe. Fall River is currently negotiating a "no-cost" time extension with Eastern to complete the project.

### Medway High School

It should also be noted that on Eastern's revised Update Statement of March 10, 2003 the status of the Medway High School project was revised from "on schedule" to "not on schedule". Discussions with team members familiar with this project indicate that there are significant subcontractor management issues, especially with respect to the site. We have been told that Eastern's site subcontractor has filed for bankruptcy.

### Lincoln-Sudbury High School

We spoke with Jack Ryan, Chairman of the Lincoln-Sudbury High School Building Committee, who indicated that he would not agree that this project is on schedule. In fact, he indicated that Eastern had gotten so far off the original baseline schedule that the Committee asked Eastern to submit a recovery schedule. It is that revised schedule that Eastern is behind and, in the opinion of Mr. Ryan, that the Construction Manager and a number of Building Committee members are skeptical that Eastern can meet. Eastern reported this project as on schedule on their revised Update Statement.

### Fairhaven High School

This project was not identified as a current project, but it is reported that this project remains incomplete. We have been told that the original contract time for completion of construction was 26 months, but that it took 42 months to reach Substantial Completion. Issues relating to not completing the punch list work are addressed under Part 3 – Project Performance.

It is understood that not all projects are on schedule. For various reasons, some which are beyond the control of the general contractor, projects get delayed. For example, this winter has probably had some impact on construction projects throughout the state. However, the bidder does have an obligation to correctly report the status of the project. It does not ask the general contractor if they believe the project will be completed on time or if it opened in time for school to start. The question asks if it is "on schedule". This is a yes or no question. It means did the contractor meet the contract date for completion, if Substantial Completion has been reached, or is the project progressing in accordance with the current accepted project schedule, which meets all contract completion dates as required by their contract with the Owner. The bidder has the opportunity to provide supplementary information as they see fit to explain an apparent negative response.

# HEERY

Letter to Jill Dagilis
March 19, 2003
Page 4 of 8

This is an important issue for the Awarding Authority to assess, as there are significant tenant fit up time requirements (approximately five months) once the contractor is Substantial Complete to get the new Worcester Vocational High School ready to open on time. If the general contractor does not meet the contract timeline for construction the ability of the City to open the school as scheduled in the fall of 2006 will be greatly compromised.

## DCAM Update Statement: Part 3 – Project Performance

Question C asks, "*Has your firm failed or refused to complete any punch list work under any contract?*" Eastern answered this question "*No.*" In performing due diligence on the original bid submission, Fairhaven Town Administrator, Jeffery Osuch was contacted and indicated that their High School project, on which Eastern was the General Contractor, remains incomplete and that Eastern has not been on the project for about a year and a half. It was reported that this project was to be completed within 26 months but reached Substantial Completion in 42 months. He noted that the Town has already independently contracted for about $200,000 in punch list work that Eastern did not complete and that the Town is currently withholding about $300,000 in funds from Eastern's contract for work not completed over a year and a half ago. This project was not reported as a current project on Eastern's Update Statement.

Following receipt of Eastern's revised Update Statement on March 10, 2003, I contacted Mr. Osuch again and discussed Eastern's representation that they did not complete the "*punch list issues and other matters... ...by mutual agreement with the Town.*" He indicated that the Town would liked to have had some type of understanding with Eastern but that they did not have an agreement with Eastern to cease the punch list work. He added that Eastern was aware that the Town was proceeding to complete the outstanding punch list work on their own. When ask whether, in his opinion, Eastern misrepresented the situation with this statement his response was yes.

We also contacted Mr. Andrew Tillett, Chairman of the Fairhaven School Building Committee, who indicated that Mr. Osuch was more than kind in his comments concerning Eastern. Mr. Tillett indicated that, in his opinion, " *Eastern basically abandoned the punch list of some 400 items...*". He acknowledged issues with the Architect, however he indicated that had little if anything to do with Eastern leaving the project incomplete. He added, "*....the project reached Substantial Completion very late and they (Eastern) just didn't get it done.* "

Eastern was given the opportunity to respond to this specific concern in our letter of March 6, 2003. The two-sentence response by Eastern minimizes the importance of this concern of the City and attempts to deflect responsibility to the Architect. Eastern's Update Statement was inaccurate in not answering Question C affirmatively and also in not reporting this project as a current project on their Update Statement that they have not yet completed.

## Question F asks " *Has a subcontractor filed a direct payment claim against your firm on a public project?* " In their original Update Statement Eastern answered the question " *Yes* " and provided Attachment A that indicated three (3) claims against them. However, in the revised Update Statement, Attachment A was modified to include a total of thirteen (13) claims for direct payment, all which are dated between the time of their latest DCAM certification, February 28, 2002 and the date of their bid submission.

# HEERY

Letter to Jill Dagilis
March 19, 2003
Page 5 of 8

Question I asks, " *Has any employee or other person suffered an injury resulting in complete disability in excess of thirty working days in connection with any of your projects?* " Eastern response was " *Yes* " and provided Attachment C that states " *For the period of Feb. 28, 2002 through January 31, 2003, we experienced (3) injuries, which resulted in more than 30 days of disability.* " In their revised Update Statement, dated March 10, 2003, Eastern reported a total of five (5) open claims for workers compensation at the time of the submission of their bid on February 11, 2003.

## DCAM Update Statement: Part 4 – Legal Proceedings

Question A asks " *Have any judicial proceedings been brought or concluded adversely against your firm or a principal or officer of your firm relating to the procurement or performance of any construction contract, including actions to obtain payment brought by subcontractors, suppliers or others?* " Eastern answered this question " *Yes* " and provided Attachment B that outlined thirteen (13) legal proceedings for the period 4/30/02 through 09/23/02.

In their revised Update Statement of March 10, 2003, Eastern submitted a revised Attachment B that identified twenty-three (23) on-going legal proceedings for the period 4/30/02 to 2/26/03[1]. However, of the 23 proceedings, it appears that in one proceeding Eastern is the plaintiff and three (3) additional proceedings are dated following the submission of their bid on February 11, 2003. We do not consider these four proceedings to be relevant to our review. This resulted in a total of six (6) new legal proceedings added in the revised Update Statement of March 10, 2003.

Question I asks " *Have any judicial or administrative proceedings been brought or concluded adversely against your firm or a principal or officer of your firm relating to a claim of repeated or aggravated violation of any state or federal law regulating labor relations or occupational health or safety?* " Eastern answered " *No.* " However, they provided an additional comment within Attachment D stating " *For the period of November 1st through January 31st, 2003 we experienced (0) OSHA inspections.* " In their revised Update Statement this comment was revised to " *For the period of February 28, 2002 through March 10th, 2003 we experienced (2) OSHA inspections.* "

In his letter of March 10, 2003, Eastern's attorney, Mr. Quinlan states " *The provisions of the Update statement form Part 4 question I refer to "repeated or aggravated" which this violation was not. There is however a second reference to OSHA violations under item K which appears to be duplicative. Eastern advises that the employee who was involved in this occurrence had been warned previously and has since been discharged from employment.* " We interpret this statement to mean that the information provided in the Update Statement as Attachment D, under Part 4 Item I, should have been recorded under Part 4, Item K.

---

[1] Attachment B identifies a proceeding with the Title of Action of G. Lopez Construction vs. USF&G & ECI as intervenor Def. & 3rd Party Pltf. This is dated 02/26/00. Due to the sequential placement of the information and that these proceedings are assumed to be subsequent to the last DCAM Certification, dated February 28, 2002, we have assumed this date is incorrectly reported and have assumed this date to be 02/26/03.

# HEERY

Letter to Jill Dagilis
March 19, 2003
Page 6 of 8

Question K asks, " _Has your firm been fined by OSHA or any other state or federal agency for violations of any laws or regulations related to occupational health or safety?_ "  Eastern replied " _Yes_ " and provided Attachment D that states " _For the period of February 28th, 2002, date current Certificate of Eligibility was issued, through January 31st, 2003, we paid a penalty of $700. [ECI Electrical Division – Hudson.]_ "    However, in their revised Update Statement of March 10, 2003 Eastern reported that, in addition to the two (2) new OSHA inspections identified under Part 4, Item 4, " _For the period of February 28th, 2002, date current Certificate of Eligibility was issued, through March 10th, 2003, Eastern paid a penalty of $700. [ECI Electrical Division – Hudson.] (and) Eastern paid a penalty of $1625 – [Normandian Middle School, New Bedford.]_ " According to the OSHA web site it appears that there were three (3) separate OSHA violations issued to Eastern on the Normandian Middle School with the penalties, following the informal conference, totaling $1625.  The complaint was filed on 1/17/2002 and the case was closed on 1/29/2003.  The notification of this violation is within the timeframe requiring that it be reported within their Update Statement.

In response to our question as why Eastern did not report this fine on their initial Update Statement, Mr. Quinlan responded " _I have attached a copy of the settlement agreement and citations which were to my understanding modified during the informal conference by OSHA to indicate that the violations would be classified as 'other than serious.' I believe that the resolution of those citations on that basis created the belief and circumstances in which inclusion of those items on the update statement may have been deemed unnecessary._ " It is a fact that at the completion of the settlement agreement that the OSHA fines, although reduced, were still in place and were required to be reported on the Update Statement.  Question K does not require only serious violations be reported, it requires all fines to be reported.

### DCAM Update Statement: Part 5 – Supervisory Personnel

Part 5 requires that the bidder " _List all supervisory personnel, such as project managers and superintendents, who will be assigned to the project if your firm is awarded the contract._ "  In their original bid submission Eastern listed two (2) individuals:

Frank T. Marino – Project Manager
Paul Agliar - Superintendent

The project specifications requires a minimum of four (4) full-time on-site project staff that includes: 1) a full time, on-site project manager, 2) a full time, non-working superintendent, 3) a full time, on-site scheduler and 4) a full time, on-site MEP coordinator.  Based upon our experience with Mr. Marino and Mr. Agliar, from working with them on a number of previous projects, it was our belief that Eastern did not meet any of the minimum project staffing requirements.  Mr. Marino is a project executive.  We understand that he is currently working on at least four or five other projects, so his involvement on this project would be in a periodic oversight role only.  Also, Mr. Agliar, although a very talented and driving superintendent, has historically been a "working superintendent."  There was no mention of any other additional staffing planned for this project.

# HEERY

Letter to Jill Dagilis
March 19, 2003
Page 7 of 8

In their revised Update Statement of March 10, 2003, Eastern changed their supervisory personnel to include:

Frank T. Marino – Executive Project Manager
Amol Prabhu – Project Manager
Paul Agiiar – Superintendent
Paul E. Chouinard – Environmental Impact Coordinator

Under separate cover Eastern's attorney, Mr. Quinlan, indicated that Mr. Prabhu and Mr. Agiiar would be assigned to the project full-time. However he noted that Courtney Lackard would be assigned to the project for CPM scheduling and that Eastern "anticipates" assigning Mr. James Ellauch to this project as MEP coordinator and HVAC Project Manager. The revised supervisory personnel listing does not meet the minimum project staffing requirements of the general contractor, since only two individuals were noted as on-site full time. Staff managing the work of any filed subcontractor, including Eastern Contractor's mechanical division, would be in addition to the minimum requirements of the general contractor. During one of our reference checks on March 13, 2003 we discovered that Mr. Prabhu is currently working as the project manager on the Normandin Middle School in New Bedford. The City of New Bedford expects that Mr. Prabhu will remain on that project until it is complete in December of 2003.

On March 14, 2003 we received an additional 24 pages of correspondence from Eastern presenting an alternative project team for consideration by the Awarding Authority. This team replaced Mr. Prabhu as project manager with Mr. Mike Gearan, it also replaced Mr. Agiiar with Mr. Kmiec, and elevated the involvement of Mr. Blauch and Mr. Lackard to full time status. In this correspondence Eastern provided some DCAM contractor evaluation forms from selected projects. Mr. Blauch's availability to work on this project full time is still unclear as we understand that he oversees all of Eastern's HVAC work, including other HVAC only projects. Also, the role of the MEP coordinator is separate from that of the project manager for the HVAC subcontractor and Mr. Blauch is still identified in this dual role.

The staffing outlined in the original Update Statement clearly does not meet the project requirements. The revised Update Statement of March 10, 2003 does not appear to meet the minimum project on-site staffing requirements. It also represents certain staff as available for this project that appear to be committed to another project.

# HEERY

Letter to Jill Dagilis
March 19, 2003
Page 8 of 8

## Summary

The issue is not that Eastern had problems on a number of their projects. Many contractors have problems on projects for various reasons, some which are outside their control. It should not be interpreted that only the problem projects were analyzed, some references were very happy with Eastern. In fact, we are currently completing a very successful project with the Town of Lynnfield, on which Eastern is the General Contractor.

However, the Awarding Authority must be able to rely on true, accurate and complete information in the bid to evaluate the responsibility of each of the bids. When information is not factually reported in a bid or on an Update Statement, then the credibility and integrity of that bidder should be called into question and challenged.

Eastern was given two opportunities to factually report the information required to be submitted with their bid. Had Eastern provided accurate information with their initial bid the responsibility of their bid might not have been questioned. Eastern responded with 99 pages of additional information for our review attempting to respond to the issues outlined in our request. However, since information provided in their revised Update Statement remains inconsistent with reference data received during our review, the responsibility of their bid remains in question.

It is our opinion that the Awarding Authority should seriously consider the rejection of Eastern's bid due to the reasons outlined in this letter. We stand by ready to assist the City in further due diligence in support of their decision of Award.

Sincerely,

HEERY INTERNATIONAL, INC.

Thomas E. Ellis, Jr., AIA
Program Director

c:    Richard Trifero, Chief Clerk of the Works / City of Worcester
      Robert Para, Architect / Lamoureux Pagano Associates

Filecode: 0208002 f6



**HOOVER EXHIBIT B**

REJECTION LETTER TO EASTERN



THOMAS R. HOOVER
CITY MANAGER

CITY OF WORCESTER

March 26, 2003

**Via Facsimile**

Ramesh K. Motwane, President and CEO
Eastern Contractors, Inc.
571 Union Avenue
Framingham, MA 01702-5855

Re:    General Construction Contract - Worcester Vocational High School

Dear Mr. Motwane:

I regret to inform you that, after a careful review that included the bid and other materials submitted by Eastern Contractors for this contract, I have determined that Eastern is not the lowest *responsible* bidder as that term is defined by Massachusetts law and, therefore, the city of Worcester is rejecting your bid for this project.

The Worcester Vocational High School Project is probably the largest single school project in the Commonwealth and the largest construction contract ever awarded by the city of Worcester. The project scope is complex, its schedule is demanding and critical, not just to the successful completion of construction, but also to the education of Worcester's vocational students. The project site abuts Green Hill Park and vernal pools and wetlands of special environmental sensitivity. These challenges require that construction activities are conducted carefully and to a timely completion. The city recognized the challenges that these issues present and included specific project management and supervisory staffing requirements in the bid specifications.

The Eastern bid is not responsible because it fails to demonstrate that Eastern possessed the skill, ability and integrity to perform this particular contract. The bid, and subsequent materials you supplied, failed to meet the project management requirements of the bid specifications and it omitted relevant information regarding the timeliness of its performance, the existence of litigation and safety violations on other projects. The city also extensively reviewed Eastern's past and present public sector construction contracts, including contracts performed for the city of Worcester. That review reveals repeated instances of instability in the assignment of supervisory personnel to a particular project, failures to maintain project schedules, inordinately long project close out times (i.e., punchlist completions), poor subcontractor relationships and adverse relationships with awarding authorities.

Worcester
All-America City

508 799 1163   P.11                         LAW DEPT CITY HALL                    APR-04-2003 13:12

Nevertheless, the city chose to allow Eastern an opportunity to supplement its Update Statement to address project supervision and other issues of omission or mischaracterization. The additional information submitted by Eastern failed to demonstrate that it would meet, and could continue to meet throughout the duration of the project, the supervisory requirements of the contract. Frankly, although voluminous, the original information and responses submitted by Eastern were incomplete and contained material omissions that call into question Eastern's ability to be candid and complete in its dealings with an awarding authority. As such, these submissions and responses fail to demonstrate the "integrity" component of the "skill, ability and integrity" required by law to be a responsible bidder for a particular project.

All of these issues bear directly on the skill, ability and integrity of Eastern to complete all of the contract requirements of the Vocational High School contract in a timely fashion so as not to impair the educational opportunities for Worcester's vocational students.

I must, therefore, inform you that Eastern's bid for this contract has been rejected.

Sincerely,

*Thomas R. Hoover*

Thomas R. Hoover
City Manager

cc:     Dr. James A. Caradonio, Superintendent of Schools
        Jill C. Dagilis, Commissioner of Code Enforcement
        David M. Moore, City Solicitor



**VENA, RILEY, DEPTULA, LLP**

April 5, 2005

250 Summer Street, 2nd Floor
Boston, MA 02210

Phone: 617.951.2400
Fax: 617.951.2420

Sabatino F. Leo
Email: sleo@vrdllp.com

*Via Facsimile Transmission and First Class Mail*

Donald V. Rider, Jr.
Assistant City Solicitor
City of Worcester Law Department
City Hall, Room 301
Worcester, MA  01608

RE:    *Eastern Contractors, Inc. v. City of Worcester, et al.*
        *United States District Court of MA C/A No.: 03-12216-MLW*

Dear Attorney Rider:

        Please be advised that, it is our intention to conduct the depositions of the City of Worcester the week of April 11th, 2005.  As discussed previously, we request that Mr. Thomas Hoover, Ms. Jill Dagilis, Mr. Eric G. Twickler and Mr. Rick Trifero be produced pursuant to Fed.R.Civ.Pro. 30(b)(6).

        As you are well aware, Magistrate Alexander granted our discovery extension only in part, ruling that all depositions (excluding experts) be completed by April 29, 2005.  That date is rapidly approaching.  That being said, as our Notice of 30(b)(6) Deposition was served on the City of Worcester on January 15, 2005, we believe that the City has been provided ample time in which to procure and prepare the referenced deponents for deposition.

        At your convenience, please contact me directly so that we may further discuss this matter.

        Thank you for your courtesy and cooperation in this regard.

                                Sincerely,

                                Sabatino F. Leo

cc:    Edward J. Quinlan, Esq. (via facsimile and first class mail)
        Warren Hutchison, Esq.  (via facsimile and first class mail)